STANDARD MACH. CO. v. RAMBO & REGAR, Inc.

(Circuit Court, E. D. Pennsylvania. August 11, 1910.)

No. 43.

1. PATENTS (§ 328*)—VALIDITY—CIRCULAR KNITTING MACHINE.
    The Houseman patent, No. 774,473, for a circular knitting machine, claim 22, which is a broad fundamental claim, in view of the prior art, is unwarranted, and void for anticipation.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. PATENTS (§ 72*)—VALIDITY—ANTICIPATION.
     A patentee cannot avoid anticipation of broad claims by showing the presence in the alleged anticipatory device of elements which would not obviate infringement of such broad claims.

     [Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 86–91; Dec. Dig. § 72.*]

3. PATENTS (§ 328*)—ANTICIPATION—CIRCULAR KNITTING MACHINE.
     The Wilcomb patent, No. 645,676, for a circular knitting machine, claims 4 and 8, which are substantially for a thread catcher, which engages such threads as are at times inoperative when knitting striped or reinforced work, are broader than the invention of the patentee, and void for anticipation in the prior art.

In Equity. Suit by the Standard Machine Company against Rambo & Regar, Incorporated. On final hearing. Decree for defendant.

Harding & Harding, for complainant.
Wilmarth H. Thurston, for respondent.

BUFFINGTON, Circuit Judge. This bill charges infringement of claim 22 of patent No. 774,473, granted November 8, 1904, to Houseman, and of claims 4 and 8 of patent No. 645,676 granted March 20, 1900, to Wilcomb. Both patents concern circular knitting machines. Such machines have two cylinders, one carrying the needles, and called the "needle-cylinder," the other carrying the cams, and called the "cam-cylinder." The cams operate on the butts of the needles, and cause them to reciprocate longitudinally and consecutively, and thereby receive the yarn in their hooked ends, and then draw such looped yarn through the loop of the previous course. The fabric adjacent to the needles lies over the end of the needle-cylinder, and, as the ends of the needles pass below the cylinder end, they shed the old loop and pull the new one through it. Hence it will be seen the greater the needle reciprocation the longer the loops will be. Such variation is determined by the distance between the top of the needle-cylinder and the lowest point of the stitch cam. This lengthening of stitch produced what is termed fashioning or the shaping of the stocking to conform to the calf of the leg.

Addressing ourselves, first, to the Houseman patent, we note that fashioning was well known and successfully practiced in circular machine knitting. We find examples of mechanism, therefore, for example, in the patent of Coburn, No. 395,314, of January 1, 1889, where as shown in figure 2 there are "inclines, H, which inclines correspond with inclines, I, in the lower end of the needle-cylinder, and the cylinder rests on said ring, so that by turning the ring or annulus the needle-cylinder may be raised or lowered." While, as stated, the device "is particularly designed to control the position of the needle-cylinder vertically, so as to gradually lengthen and shorten the stitches in knitting a tubular web for a stocking to the end that such tubular web may be formed to fit the leg and foot of the wearer," yet it will be observed that the incline or eccentric by which this is accomplished is fixed and nonvariable. Of the same general type is patent No. 529,508

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

of November 20, 1894, to Stewart, wherein as said by respondent's expert:

"Cam 14 has an eccentric surface gradually increasing in radius all the way around from the lowest to the highest point (practically like the Coburn construction)."

It will be thus seen that these types of machines, while they fashioned the stocking leg by a range of stitch, were limited in such range and in its progressive size by the fixed nonvariable character of their inclines, which were integral, inseparable parts of the machine. In the patent of Hemphill, however, No. 629,503 of July 25, 1899, we find a departure from this nonvariable eccentric practice. It is true Hemphill's machine was for knitting half hose, in which there is no fashioning, but its significance lies in the fact that his mechanism is addressed to lengthening the stitch. And, while he uses this loop lengthening in the heel and toe of half hose to permit the use of an additional or reinforcing thread, it is substantially the same loop lengthening which when used in knitting the leg of a stocking permits fashioning. In his device Hemphill embodies in the same roller removable and changeable members, whereby the level of the needle-cylinder is changed in order to affect the length of stitch in the heel and toe portions of half hose. This is done by means of two eccentric cam surfaces, one for the heel and one for the toe, each of which are detachably mounted on the cam-roller. Now, to our mind, this construction so suggestively disclosed the general principle of adapting, in circular machine knitting, a cam-roller to adjustable, and therefore, if desired, variable eccentric capacities, that thereafter no one could monopolize that general idea or cover all means for accomplishing such result. Indeed, were the question of the patentable novelty of what even Hemphill did now before us, we would feel impelled to give due weight and regard to the fact that the general principle of obtaining variable effects in the same mechanism from eccentric variation therein was a prior mechanical principle and practice for which it suffices to refer to the Jones patent, No. 284,860, dating back to 1883, for a variable cam adapted "to increase or diminish the circumferential extent of this swell by the adjustment of one of the plates so that the cam may have a longer or shorter swell on the roller or other object which the cam has to actuate."

Without then discussing the testimony relative to other phases of the prior art, we inquire as to what advance Houseman made therein, and especially what he was entitled to claim in view of his disclosure. His improvement, stated in his words in his specification, is:

"A quadrant of this cam-roller is partially cut away and there is inserted a portion in eccentric with the remainder of the cam-roller. This piece or portion $m$ is secured by the screw, $m'$, working in the slot, $m^2$. By moving this portion in and out the slot the eccentricity may be varied. In order, however to prevent a ledge being formed at the point of juncture of the inserted portion with the remainder of the cam-roller $M$ at the point where in the rotation of the cam-roller M the follower, $l^2$, passes this point, I form the slot in a line at right angles to a line drawn from this point to the center of the cam-roller, and thus with any outward or inward motion of the pin, $m'$, the juncture of the main portion of cam-roller M and the portion $m$ are at the same level. The follower, $l^2$, is made of such width as to cover both the por-

tion, *m*, and the main portion of the cam-roller at the point where the eccentric quadrant is inserted."

Accepting as correct the contention of complainant's expert that Houseman was granted protection for this specific device in claim 23 which reads as follows: "In a circular knitting machine, in combination, a needle-cylinder, supported so as to be vertically movable, a roller having a portion thereof cut away, a piece inserted therein eccentric with the remainder of the roller and adjustable thereon in a line at right angles to a line from the juncture of the inserted piece and main portion of the roller at the periphery to the center, means to rotate said roller and connection between said roller and the needle-cylinder support"—we next inquire whether in addition thereto he was entitled to the protection of claim 22 here in controversy. That claim is a broad one, and, if sustained, would close the door against any one seeking to vary his cam-roller through an adjustable eccentric portion of any kind or in any way. We cannot countenance such a result. The improvement of Houseman was not fundamental. There is no proof of its great utility or its general adoption or of its supplanting, when used, other forms of circular knitting machines. Claim 23 presumably afforded complete protection for the only form of device Houseman disclosed and to make such a subordinate device a means of burdening a successful industry through a broad, fundamental claim would to our view pervert the avowed purpose of the patent law which is to encourage, and not to throttle, improvements. We are therefore of opinion that claim 22 was unwarranted and should be adjudged invalid.

We next turn to the patent of Wilcomb No. 645,676, of March 20, 1900, which as we have seen is also for a circular knitting machine. The fourth and eighth claims are by this bill alleged to infringe. They are substantially for a thread catcher which engaged such threads as at times were inoperative when knitting striped or reinforced work, and thus prevented entanglements.

Wilcomb describes as follows the object he had in view:

"My invention relates to circular-knitting machines of that class in which a plurality of threads are fed to the needles to produce striped or reinforced work and in which the threads thrown out of work remain attached to the inner side of the tubular fabric. It is the object of my invention to provide means for taking care of the threads which are out of work and which in the continued revolution of the machine become twisted and entangled, tending to draw the fabric up through the cylinder and interfering with the successful working of the needles and also drawing and distorting the loops of the fabric where the threads are attached to it or breaking the thread away from the fabric in case of tender yarn. My invention is designed to obviate these difficulties and defects by providing a thread-engaging device which in the revolution of the machine engages the loosely-attached inactive thread and draws it to the center of the cylinder where it is held, so as to prevent it from interfering with the work."

The means by which he accomplishes this object are, as disclosed in his patent, as follows:

"My invention consists of a take-up finger or thread engaging and measuring device, F, arranged to work inside of the needle circle, having a scroll form, the longer curved end 4 of the scroll reaching out near to the needle row just back of the thread feeds. This end of the thread-engaging device, or

scroll I prefer to give a slight curve upward to enable it more readily to pass above the thread that is attached to the fabric in the first few revolutions of the machine after the thread has been thrown to the center of the cylinder by being caught by the engaging device as shown in Fig. 1. The smaller curved end or eye, 5, of the scroll works approximately in the center of the circle of needles. As the cam-ring revolves this thread finger or scroll engages the loosely-attached thread extending from the thread-guide to the fabric and draws it to the center of the needle-cylinder to the small part of the scroll, thereby drawing the yarn from the spool or supply. This thread-finger is set slightly above the top of the needle-cylinder, so that the thread-finger will pass above the thread where it is attached to the fabric, and at each revolution of the machine the thread is passed underneath the thread-finger, preventing the fabric from lifting. As the fabric feeds down through the cylinder more yarn is drawn from the supply end, and this strand or all these strands are held taut and never become slack or interfere with the work. When any of these inoperative threads are brought into action again, the loop end is still held by the scroll until the needle has drawn the new thread into the body of the fabric, when the long upturned end of the scroll will immediately pass above this part of the thread, and the continued revolution of the machine will allow the loop (both ends of which are now attached to the fabric) to slip off the small curved end of the scroll. This thread is now attached to the fabric in two places and hangs loosely on the inside of the fabric in the form of a loop. * * * In the case of a reinforced fabric where only one strand of thread is used in addition to the main thread this scroll operates on this reinforcing-thread in the same manner, keeping it taut at all times, preventing the thread from flying into engagement with the needles, and thus making imperfections in the fabric. * * * I do not wish to limit myself to an engaging device of the exact scroll-like form shown, as I am aware that surfaces of other forms would catch and hold the threads, and the scroll may be made in a manner different from that shown. I have illustrated in Fig. 3 one instance of the manner in which the engaging device may be modified, which figure shows the device in the form of a hook, E, of substantially U-shape."

Upon this device, several specific claims involving the scroll-like structure were granted, of which claim 2 is an example, viz.:

"In combination with a circular-knitting machine having multiple feed devices, a thread-engaging device having a scroll-like surface to engage the inactive or floating threads on the inside of the fabric, substantially as described."

None of such claims are here in controversy, but the claims involved are of much broader character, in that the thread-engaging devices have practically no limitation. These claims are (4) "in combination with a circular-knitting machine having multiple feed devices a thread-engaging device inside the needle row to guide and hold the inactive floating threads extending from the fabric to the feed out of engagement with the needles and adapted to release the thread when it is introduced to the needles again, substantially as described," and (8) "in a circular-knitting machine, in combination, a plurality of thread-carriers, and means to move one or more of said thread-carriers in and out of operative position, and a device within the needle-cylinder adapted to catch and retain the thread to the carrier out of operative position."

Now, it is clear that the only device Wilcomb disclosed was the scroll shaped one he described. Such a scroll shape he specifically outlined and in it he alleged his invention lay, and while in words we have quoted above he properly guarded himself against modifications thereof, yet the fact is clear that nothing was disclosed in his specification

save the scroll-like structure. For this, as we have seen, he made claims, and such claims presumably protected him from any use thereof or of any substantial or equivalent reproduction. But such claims, as we have seen, are not alleged to be infringed by respondents, but complainant would hold them as infringers, because it is alleged they come within the much broader scope of the claims in question which without limitation to a scroll-like structure covers in the fourth claim any "thread-engaging device inside the needle row" adapted to guide, hold, and release the inactive thread, and, in the eighth, "a device within the needle-cylinder adapted to catch and retain (return?) the thread to the carrier out of operative position." We are thus brought face to face with the question whether the specific, scroll-like structure Wilcomb devised and disclosed to the public warranted him in claiming a monopoly over all the thread-engaged devices covered by the broad claims here involved. To our mind clearly not, and we think the disclosure of the prior art strengthen such conclusion. For example, in Appleton's patent No. 425,362, of April 8, 1890, we have a circular-knitting machine. It has multiple feed devices and a thread-engaging device inside the needle-row. During the knitting for which it is adapted, namely, when a movable yarn-guide to control, an extra thread is employed in connection with a nonmoving yarn-guide which knits all the time, its thread-engaging device guides and holds the inactive thread, and is adapted to release it when it is reintroduced to the needles. It is said, however, that such machine is limited to styles of knitting different from Wilcomb's, and that it avails itself of tension to accomplish its object. It should, however, be noted that Wilcomb also alleges his device is adapted to "reinforced work." But, ignoring such fact, it still remains that there is no limitation in either of these particulars, viz., tension or reinforcing work in the claims in controversy, and, if they are valid, an infringer could not, by embodying such features or capabilities to his machine, thereby escape infringing. So conversely a patentee cannot avoid anticipation of broad claims by showing the presence of elements which would not obviate infringement of his broad claims. Indeed as respondent's expert properly says:

"Both claim 4 and claim 8 of the Wilcomb patent might as well be predicated upon the construction shown in the Appleton patent as upon that specifically shown in the Wilcomb patent itself."

Moreover, the broad scope of those claims is such that standing by themselves they contain no limitations which preclude their application also to the thread-engaging device shown in the patent to Stewart No. 451,703 of May 5, 1891, for a thickening thread-feed mechanism for knitting. Without, therefore, commenting further on other practices of the prior art, we are of opinion that in view of the instances cited, of the comparatively narrow sphere of Wilcomb's device with relation to the developed art of circular knitting, and to the absence of proof of its general adoption, he cannot sustain the claims in controversy. And, in considering these prior instances, we are not to be misunderstood as finding in them an anticipation of Wilcomb's scroll-like device. That would be a pertinent inquiry were the claims

for that specific device here in question, but their relevancy consists in their bearing on the broad, fundamental claims which could only be sustained by ignoring the thread-engaging devices of the prior art entirely. While conceding for present purposes, Wilcomb's right to these specific claims he made, it by no means follows he is entitled to the broad ones here in controversy.

Let a decree be drawn dismissing this bill.